HILLARY J. CRAIN, Judge Pro Tem.
|2This is an appeal by Centerlink, Inc. and Edward St. Louis, plaintiffs-appellants, from a judgment dismissing their claims arising out of certain leasing and property management contracts with Sar-py Properties, L.L.C. and A. Lester Sarpy, defendants-appellees. For the following reasons we affirm the judgment.
In 1993 and 1994, Sarpy Properties, L.L.C. and A. Lester Sarpy (Sarpy) contracted with Centerlink, Inc. and Edward St. Louis (Centerlink) to be its leasing agents and property managers for West-side North Shopping Center, Pontchartrain Square Shopping Center, and Azalea Plaza Shopping Center.[1] These arrangements lasted for some nine years, during which time Centerlink was paid a management fee, as well as commissions on all of the leases and renewals that it had negotiated on behalf of Sarpy in the shopping centers.
In September of 2002, Sarpy sold the Westside North property for 5.75 million dollars. Centerlink claimed that it was owed a commission on this sale under an implied verbal agreement. Sarpy denied that there was such an agreement and refused to pay the commission. Sarpy also took the position that because he no longer owned the center, the lease commissions would no longer be paid. At about this same time, Sarpy similarly stopped paying lease commissions for the Pontchartrain and Azalea centers, which were subsequently sold in 2005. ^Discussions among the parties failed to resolve these disputes as to what sale and lease commissions were owed, and this litigation resulted.
The pertinent particulars of the parties’ dealings are as follows. In 1993, Sarpy and Centerlink entered into two essentially identical contracts for the operation of the Westside and Pontchartrain centers. There is disagreement as to whether a *779 third contract for Azalea existed, but Cen-terlink operated that center as it did the other two. These contracts gave Center-link control over the management and leasing of the centers, as well as all accounting functions related to these operations. However, final approval of all leases was reserved to Sarpy. Sarpy testified that these arrangements worked smoothly until the time that he began negotiations for the sale of Westside. He said that he met with St. Louis on a monthly basis over the years and received financial statements at these meetings. He further indicated that he eventually paid little attention to the particulars of the operations, and relied on Centerlink’s representations of the financials.
When Sarpy began negotiations for the sale of Westside, the prospective buyers were concerned about what lease commissions were owing to Centerlink. These buyers had no problems with paying lease commissions that were spelled out in many of the individual leases. They objected, however, to paying such commissions where the lease agreements were silent as to the commissions. Centerlink claimed that although there was no language in many of the leases regarding commissions, they were nonetheless owed under the terms of the overall management contract with Sarpy. Centerlink’s claim for the additional commissions was based on a leasing commission schedule attachment to the management contract which listed various percentages for different types of leases and renewals which were to be negotiated by Centerlink. It appears that the buyers had no intention of using Cen-terlink to manage the properties, and therefore they |4were not going to pay commissions on the basis of the management agreement between Sarpy and Cen-terlink when they acquired the property. Further, Sarpy had terminated the management agreement for Westside as of August 2, 2002, the date the center was sold.
As a result of the disputes over the sales and lease commissions, Sarpy began withholding various lease commissions for Westside beginning in late 2002. In 2003 and 2004 he began withholding commissions for Pontchartrain and Azalea. The management agreement for Pontchartrain had actually been cancelled on June 1, 2001, and that for Azalea on September 17, 2002. Centerlink and St. Louis sued Sar-py to recover these lease commissions and the sale commission which was claimed in conjunction with the sale of Westside. They also sought reimbursement for office furniture, damage to their reputation, and attorney fees and costs under the terms of the management agreements. Sarpy reconvened seeking refund of lease commissions which allegedly had been overpaid over the years on certain leases. This claim was eventually withdrawn.
In the final judgment the court rejected Centerlink’s claim for a commission on the sale of Westside. Of the 44 leases in effect at the three shopping centers, the court rejected Centerlink’s claims for commissions as to 32 of the leases, and awarded commissions for the remainder based on the specific terms of each lease. Commissions for several other leases were denied either because the leases never went into effect, or they were confected after Cen-terlink was no longer managing the properties. The claims for office furniture and damage to reputation were rejected. Attorney fees were not awarded to either party, and each party was cast for its own costs. Centerlink now appeals.
Because many of the errors alleged here relate to factual determinations, we initially note that the standard of review of such determinations is whether they are ^manifestly erroneous or clearly wrong. Stobart v. State, 617 So.2d 880 *780 (La.1993). As explained in Stobart, the issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusions were reasonable based on the entirety of the record. Moreover, when there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous. Id.
The first issue is whether a commission on the sale of the Westside property was owed. St. Louis testified that there was an implied verbal agreement under which he would earn a broker’s commission for this sale. He noted that Sarpy had involved him in presenting the operational and financial particulars of the center’s operation to the prospective buyer, and that in authorizing him to perform these duties Sarpy had implied that he would compensate St. Louis as a broker. By his calculations, that commission would have been just under $300,000. Sarpy testified, on the other hand, that these activities are what would be expected from a property manager, and especially in this case where Centerlink had all of the information which a prospective buyer would want to see. He denied that he ever intended for Centerlink to act as a broker for the sale or that he had engaged him to do so.
In her reasons for judgment the trial judge explicitly stated that she did not find St. Louis credible. She further noted that Sarpy was a real estate developer and that it was not reasonable to believe that he and St. Louis would have entered into an agreement for the amount claimed without reducing it to writing. She finally pointed out that La. R.S. 37:1455 prohibits a realtor from offering property for sale without the written consent of the owner. Her ultimate factual conclusion was that there was no agreement whereby St. Louis was to be paid a commission on the sale of the property. It is clear that there were two reasonable views of the |f,evidence relating to the broker’s commission, and the trier of fact’s choice of Sarpy’s version of events cannot be manifestly erroneous. We therefore will not disturb this finding.
The next question concerns commissions due on the individual leases. There are two basic types of leases at issue. One type makes no provision for the payment of commissions, while the other type spells out that such commissions are owing. There is no dispute that Cen-terlink negotiated the lease terms with the various lessees, and that Sarpy retained the right to reject any lease brought to him by Centerlink. It is also undisputed that the original management agreements between Sarpy and Centerlink contained attachments which listed various commission percentages to be applied to future leases based on such factors as whether they were original leases, renewals, procured by an outside broker, and other related factors. Centerlink’s position is that because the original management agreements contained lists of commission percentages, those lists obligate Sarpy to pay those percentages for as long as the individual leases in any of the shopping centers remain in effect, through their primary term and renewal, even though Sar-py is no longer the owner of the properties and is not collecting any rents.[2] It further asserts that because Sarpy paid commissions for a number of years on the leases which did not contain any provision for such payments, that he should not be al *781 lowed to now challenge the continuation of such payments.
The trial judge rejected these claims for several reasons. She first noted that all of the leases were confected after the management agreement. Because the lists in the management agreements make only general provisions for commissions, while the leases are specific, she concluded that the latter control the obligations of 17the parties. Also, Christopher Sarpy, Lester Sarpy’s son, testified that these lists were merely illustrative of what percentages would be owed where commissions were provided for in the lease agreements, rather than constituting a specific agreement to pay these amounts in all circumstances. The trial judge found this testimony more credible than Centerlink’s representations to the contrary. She also relied on La. C.C. Art. 2683.1, which provided that “whenever a commission is owed by the lessor to a third party for perfecting the lease of immovable property, the amount of the commission and to whom it is owed shall be clearly stated in the lease agreement.”[3] She concluded that Centerlink was entitled to a commission where this was specified in a lease, but could not recover these amounts where a lease was silent.
Of the 44 leases at issue, she determined that 12 of them contained commission clauses and awarded Centerlink amounts called for in those leases. The remaining 32 leases had no commission clause and thus no award was made as to these.[4] In this court’s opinion, the analysis used by the trial judge in regard to the lease commissions was correct. Where there are general and specific clauses in a contract, the specific controls. Corbello v. Iowa Production, 2002-0826 (La.2/25/03), 850 So.2d 686. The trial judge thus properly gave effect to the specific leases, rather than the general commissions lists attached to the management agreements.
She also rejected Centerlink’s claim that because over the years Sarpy had paid commissions on those leases which did not contain a commissions clause, that he should not now be allowed to contest those amounts. Centerlink relies on|sLa.C.C. Art. 2053 for the proposition that when there are ambiguities in a contract, the court should look to the course of conduct of the parties to discern their mutual understanding of it. While this is a correct statement of the law, it requires that there be some mutual course of conduct of which both parties are aware. The trial judge noted Christopher Sarpy’s testimony that because the shopping centers were doing well under Centerlink’s management they did not pay close attention to the details of the financial reports. He further testified that it was not until disagreements arose and Sarpy began to scrutinize the reports that he discovered that Centerlink had been overpaid on some of the leases. The trial judge found this testimony credible. In this regard, she found that because Centerlink controlled all of the finances of the operations it was in effect paying these commissions to itself, rather than this being a course of conduct on Sarpy’s part. She stated that *782 she was not “persuaded by Centerlink’s argument that it should continue to benefit from, at worst, its wrongful conduct or, at best, simple error by Sarpy.”
The trial judge thus made the explicit factual finding that Centerlink controlled all of the financial operation of the properties and paid itself the disputed commissions, and the implicit finding Sarpy was not diligent in reviewing these records. She concluded, in effect, that these actions did not constitute a course of conduct between the parties. Because these are factual determinations, the manifest error standard of review applies. Our review of the record shows that they are all based on a reasonable view of the evidence, and as such we may not set these findings aside.
Centerlink also contends that the trial judge improperly disallowed commissions on four specific leases. The first, the Jason Horne lease, was negotiated by Cen-terlink and signed by the lessee, but eventually refused by Sarpy. Sarpy’s testimony was that this lease was for a martial arts studio. He said that his 1 gliability insurers required an additional premium which would have been greater than the rent under the lease and that Horne refused to pay for the additional premium. Sarpy thus refused to approve the lease. The trial judge found that in these circumstances the lease never went into effect and no commissions were owed. The second, Beauty Fashions, involved a lease which had been negotiated by Centerlink and which provided for commissions. However, when that lease expired, Beauty Fashions wanted a larger space. Sarpy negotiated that second lease himself for another location after the management agreement with Centerlink was terminated. The trial judge disallowed commissions on this lease as well. The third and fourth, Citi Trends and Hibernia National Bank, were leases that Centerlink was negotiating just prior to the sale of Westside. Sarpy had declined to accept these leases, as he was entitled to do under the terms of the management agreement. After the sale, these tenants entered into leases with the new owners. Again, the trial judge disallowed commissions because the leases were not perfected until after the management agreement was terminated and were not with any property owned by Sarpy. We find no error in any of these determinations made by the trial judge.
Centerlink claims that absent a finding they are entitled to commissions by contract, they are entitled to such based on quantum meruit The trial court determined that where Centerlink had procured rentals that warranted commissions they were provided for in the lease, and otherwise its efforts were compensated with substantial sums received under the management contract. We cannot say that the trial court was clearly wrong in reaching this conclusion. Brankline v. Capuano, 94-1630 (La.App.3 Cir.5/3/95), 656 So.2d 1.
The next issue concerns Center-link’s claim for $250,000 for damages to its reputation. This claim is based on an assertion that prior to the finalization of the Imsale of Westside, the prospective buyers began advertising for tenants. Centerlink alleged that this violated the terms of its management contract with Sarpy, which gave it exclusive listing rights to the property. The trial judge found that Sarpy was not responsible for advertising done by the prospective buyers, and thus did not breach any agreement with Centerlink. She also noted that there was no evidence of damages except for the uncorroborated assertions of St. Louis and his son. Again, these are factual determinations subject to the manifest error rule, and because they are based on *783 a reasonable view of the evidence, we may not set them aside.
The next claim was for furniture expenses which Centerlink claims were owed under the management agreement for Westside. It claims that it spent $32,000 for furniture which it later sold for $17,000 leaving a balance of $15,000 which Sarpy is obligated to pay. Christopher Sarpy testified that Centerlink’s operation as it applied to Westside involved St. Louis and two employees. He further said that St. Louis was planning to expand Center-link’s business beyond its duties to West-side and had furnished its offices for a much larger staff which would handle other business. The trial judge denied this claim stating that she found Christopher Sarpy’s testimony more credible than any evidence submitted by Centerlink. These are factual determinations for which there is a reasonable basis in the record, and we may not disturb them.
The final issue concerns attorney fees and costs. Centerlink asserts that because the management agreements provide that when legal proceedings arising out of these agreements are instituted, the “prevailing party shall recover from the other, all attorney’s fees, costs, and expenses,” it is entitled to these items. We first note that the dispute over the sale commission did not arise from the agreements. Similarly, it does not appear the claim for damage to its reputation was related to |nthe agreements, and even if it were, the trial judge found that Sarpy was not responsible for the activities of the prospective buyers about which Centerlink complained and thus did not breach the agreement. Finally, although Centerlink prevailed as to the lease commissions on 12 of the leases, Sarpy prevailed in the dispute as to the other 36. The trial judge determined that in this circumstance both parties should be responsible for their own attorney fees and costs. We deem this result to be correct.
For the foregoing reasons, the judgment of the trial court is hereby affirmed.

AFFIRMED

. Sarpy Properties, L.L.C. owned Westside North and Azalea, and A. Lester Sarpy owned Pontchartrain, but for purposes of this discussion, there is no need to constantly distinguish between these ownership interests.

. Where individual leases provided for commissions buyers of the shopping center purchased subject to the obligations of the leases. Since they did not purchase subject to the management agreement between Centerlink and Sarpy, Centerlink’s position would require Sarpy to pay commissions on rents long after Sarpy ceased to collect rents.

. Article 2683.1 was repealed in 2005, but was in effect for the time relevant to this dispute.

. The lease to Academy Sports in the West-side center falls within this category. The lease has no provision for commissions. However, Christopher Sarpy testified some commissions were owed under a separate agreement which he could not locate. He denied that the agreement would have provided for payments ad infinitum and that the commissions paid were under the management agreement. The trial court accepted this testimony and her refusal to award commissions is not manifestly erroneous.